IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JOHN W. DAVIS, JR.,                     :
    Petitioner                      :
                                 :         **No. 1:21-cv-277**
    v.                              :
                                 :         **(Judge Rambo)**
KEVIN KAUFFMAN, *et al.*,                :
    Respondents                     :

## MEMORANDUM

On February 16, 2021, *pro se* Petitioner John W. Davis, Jr. ("Petitioner"), who is presently incarcerated at the State Correctional Institution in Huntingdon, Pennsylvania ("SCI Huntingdon"), initiated the above-captioned action by filing a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. (Doc. No. 1.) Petitioner seeks release to home confinement because of the risk posed by the COVID-19 pandemic. (*Id.*) Petitioner paid the requisite filing fee on February 22, 2021. (Doc. No. 4.) In an Order dated February 22, 2021 (Doc. No. 5), the Court ordered Respondents to show cause why Petitioner should receive the requested relief. Respondents filed their response on March 12, 2021. (Doc. No. 8.)

## I.     BACKGROUND

Petitioner is serving a life sentence imposed for first-degree murder in 1981 by the Court of Common Pleas for Delaware County, Pennsylvania. (Doc. No. 8-6 at 2.) In his § 2254 petition, Petitioner asserts that he was born on December 27,

1957 "and is of the age that he is susceptible to the COVID-19 virus and the three new strains that have been detected in Pennsylvania." (Doc. No. 1 at 1.)

The Pennsylvania Department of Corrections ("DOC") began its mitigation strategy for the COVID-19 pandemic in February 2020. (Doc. No. 8-2 at 2.) The DOC's initial focus was to prevent COVID-19 "from breaching [the] fences." (*Id.*) Therefore, the DOC suspended all visitation on March 13, 2020. (*Id.*) The DOC also "began performing enhanced employee screening which included the taking of temperatures, and asking employees if they were exhibiting signs or symptoms of COVID-19." (*Id.*) Employees who failed this screening were not permitted entrance and were directed to see their primary care physicians. (*Id.*) Employees turned away have to follow a protocol in order to return to work which reflects the CDC criteria for health care workers." (*Id.*) Moreover, all incoming inmates are quarantined and "transfers among the facilities have been drastically reduced by only allowing for mission critical moves." (*Id.*) The DOC also hired an expert public health consultant to make decisions in consultation with the expert, the DOC's medical team, the Pennsylvania Department of Health, and CDC guidelines. (*Id.*)

The DOC has provided free antibacterial soap to all inmates "with messaging on the importance of handwashing to prevent spread." (*Id.* at 3.) Correctional Industries has produced more than 700,000 bars of soap. (*Id.*) Moreover, Correctional Industries provides cleaning supplies for inmates to clean their cells on

a daily basis. (*Id.*) Facilities must be cleaned three (3) times per shift "with a focus on high-touch areas." (Doc. No. 8-5 at 22.) Moreover, there are special detailed policies in place for cleaning of water fountains, electronic equipment, and food service areas. (*Id.* at 22-23.)

Personal protective equipment ("PPE") has been provided to all staff. (Doc. No. 8-2 at 3.) Correctional Industries has manufactured over 500,000 masks. (*Id.*) "All CDC and DOH protocols are being followed in reference to masking and other PPE usage throughout the facility." (*Id.*) "masks are mandatory for all staff and must be worn at all times [except when eating] throughout the institution." (Doc. No. 8-5 at 19.) Inmates must wear masks "anytime they are outside of the cell/living space." (*Id.*) Medical staff, staff working in intake, and staff working in hospital posts are provided with N95 masks. (*Id.*) Moreover, employees in intake and those accompanying inmates on outside medical trips must wear goggles or safety glasses. (*Id.* at 20.)

All facilities have screening staff that have been outfitted with masks, face shields, goggles, and gloves. (*Id.* at 15.) All employees are screened daily. (*Id.*) Employees may only access the institution if they have a temperature of 100 degrees or less, have no symptoms, and have not come into close contact with "a person who is under investigation for" COVID-19. (*Id.*) Employees who demonstrate any of

these factors are denied entry and are only permitted "to return to work when all conditions are met as outlined" by the CDC Return to Work Guidelines.  (*Id.*)

The DOC treats all staff and inmates as of they are asymptomatic carriers of COVID-19 and, therefore, potential transmitters of disease.  (Doc. No. 8-2 at 4.) Any inmates who has had direct contact with a symptomatic inmate or staff member, or with any individual who has tested positive, is placed in enhanced quarantine for fourteen (14) days.  (*Id.* at 3.)  Out of cell time is limited to showers.  (*Id.*)  "All inmates in enhanced quarantine are observed/assessed for symptomology and have their temperatures checked twice per day."  (*Id.*)  "Any inmate who has tested positive for COVID-19, or who has been tested and is awaiting results, is placed in medical isolation, and separated from all other inmates."  (*Id.*)  Inmates who come in "from the street" are quarantined for twenty-one (21) days.  (Doc. No. 8-5 at 9.) All inmates transfers, such as those from county jails, are quarantined for fourteen (14) days.  (*Id.*)  Inmates under these quarantines are checked for symptoms and temperatures once per day.  (*Id.*)  Symptomatic inmates remain in isolation until at least three (3) days have passed since recovery, which is defined as the resolution of fever without the use of fever-reducing medications, improvement in symptoms, and passage of at least fourteen (14) days from when symptoms first appeared.  (*Id.*) Asymptomatic inmates who have tested positive are isolated for fourteen (14) days "beyond the date the sample (swab) was obtained."  (*Id.*)

The DOC has implemented thorough contact tracing "to identify inmates and staff who may have had contact with an individual with influenza like illness or who has tested positive for COVID-19." (Doc. No. 8-2 at 3.)  Moreover, the DOC "tests inmates for COVID-19 that are scheduled for transfer to another correctional facility." (Doc. No. 8-2 at 3.)  Such testing occurs three (3) to six (6) days prior to the scheduled transfer. (*Id.*)  "If an inmate tests positive, the transfer is postponed, and the inmate is medically isolated for a minimum of 14 days and/or until medically cleared for transfer." (*Id.*)  Moreover, "[a]ll counties are required to test inmates 3-6 days prior to transfer." (Doc. No. 8-5 at 11.)  "Inmates must produce a negative result and be asymptomatic prior to transferring to the DOC." (*Id.*)  The DOC also tests inmates prior to transfer to detainers or other locations within the DOC. (*Id.*)

The DOC has worked with the Parole Board "to identify individuals who are otherwise eligible for release and transition them safely to the community where they can shelter in place with families." (Doc. No. 8-2 at 6.)  Moreover, on April 10, 2020, the Governor signed an executive order pursuant to Article IV, § 9(a) of the Pennsylvania Constitution and the Emergency Management Service Code, 35 Pa. C. S. § 7301, to authorize the DOC to establish a temporary reprieve program to transfer eligible inmates to community corrections centers or home confinement. (*Id.* at 7.)  To be eligible, inmates must be considered high risk should they contract COVID-19. (*Id.*)  Moreover, inmates must be eligible for release within the next

twelve (12) months or otherwise within nine (9) months of their minimum eligible release date. (*Id.*) Inmates serving sentences for violent offenses are excluded from the program. (*Id.*) The DOC's "population reduction efforts have resulted in a total reduction of nearly 2,500 inmates since March 1, 2020." (*Id.* at 9.)

Early on, the DOC initiated a statewide quarantine with inmates and staff remaining on the same housing units. (*Id.* at 4.) Inmates are provided all meals in their cells, and "they are afforded out-of-cell time for video visits, phone calls, access to the law library, as well as being provided with in-cell programming." (*Id.*) An individual who was positive for COVID-19 came into SCI Huntingdon on April 9, 2020, leading to the DOC's "most significant outbreak." (*Id.*) The first inmate at SCI Huntingdon tested positive on April 20, 2020. (*Id.* at 5.) SCI Huntingdon immediately began contact tracing. (*Id.*) Secretary Wetzel has noted that one issue at SCI Huntingdon which led to the outbreak is that it "is an old facility of an old design." (*Id.*) The "facility consists of multiple four-tier housing units that have open-bar cell doors; and all inmate and employee movement travels through a central hub area near the prison's control center." (*Id.*) Various areas were converted into isolation areas because SCI Huntingdon does not have an infirmary. (*Id.*) Moreover, approximately ninety (90) inmates were transferred to SCI Phoenix to allow better separation of inmates into smaller groups. (*Id.* at 6.) As of May 11, 2020, SCI

Huntingdon had "35 staff cases and 131 positive inmates cases, with 15 inmates having already recovered." (*Id.*)

## II.    DISCUSSION

Respondents assert that Petitioner's § 2254 petition is subject to dismissal because Petitioner failed to exhaust his state court remedies prior to initiating the above-captioned action. (Doc. No. 8 at 11.)  For the reasons set forth below, the Court agrees with Respondents.

Absent unusual circumstances, a federal court should not entertain a petition for writ of habeas corpus unless the petitioner has satisfied the exhaustion requirement articulated in 28 U.S.C. § 2254(b).  Under § 2254(c), a petitioner will not be deemed to have exhausted his available state remedies if he had the right under the law of the state to raise, by any available procedure, the question presented. *See O'Sullivan v. Boerckel*, 526 U.S. 838 (1999).  In addition, a claim is exhausted when it has been "fairly presented" to the state court.  *See Picard v. Connor*, 404 U.S. 270, 275 (1971).  To that end, the federal habeas claim "must be the substantial equivalent of that presented to the state courts." *See Lambert v. Blackwell*, 134 F.3d 506, 513 (3d Cir. 1997).  The petition must do so "in a manner that puts [the respondents] on notice that a federal claim is being asserted." *See Bronshtein v. Horn*, 404 F.3d 700, 725 (3d Cir. 2005).  "The Supreme Court has instructed that a claim is not 'fairly presented' if the state court 'must read beyond a petition or brief

. . . in order to find material' that indicates the presence of a federal claim." *Collins v. Sec'y of Pa. Dep't of Corr.*, 742 F.3d 528, 542 (3d Cir. 2014) (quoting *Baldwin v. Reese*, 541 U.S. 27, 32 (2004)).  Moreover, a habeas corpus petitioner has the burden of proving the exhaustion of all available state remedies.  *See* 28 U.S.C. § 2254.  Overall, the exhaustion requirement advances the goals of comity and federalism while reducing "piecemeal litigation."  *See Duncan v. Walker*, 533 U.S. 167, 180 (2001).

The Supreme Court has noted that these "comity considerations are not limited to challenges to the validity of state court convictions," but also include habeas actions where inmates are challenging the conditions of their confinement.  *See Preiser v. Rodriguez*, 411 U.S. 475, 491 (1973).[1]  Under Pennsylvania law, "[a]ny judge of a court of record may issue the writ of habeas corpus to inquire into the cause of detention of any person or for any other lawful purpose."  42 Pa. Cons. Stat. § 6502(a).  Such relief "is available to secure relief from conditions constituting cruel and unusual punishment, even though the detention itself is legal."

---

[1] The United States Court of Appeals for the Third Circuit has held that a state prisoner cannot challenge his conditions of confinement in a habeas corpus action. *See Williams v. Sec'y Pa. Dep't of Corr.*, 459 F. App'x 87, 88-89 (3d Cir. 2012) (citing *Leamer v. Fauver*, 288 F.3d 532, 542 (3d Cir. 2002)).  The Third Circuit, however, recently concluded that immigration detainees could proceed under § 2241 to challenge allegedly unconstitutional conditions of confinement due to the COVID-19 pandemic. *Hope v. Warden York Cty. Prison*, 972 F.3d 310, 324-25 (3d Cir. 2020). The Third Circuit cautioned that it was "not creating a garden variety cause of action." *Id.* at 324. The Court, however, need not decide whether Petitioner can challenge his COVID-related conditions in a § 2254 petition because he has not exhausted his available state court remedies.

*Commonwealth ex rel. Bryant v. Hendrick*, 280 A.2d 110, 113 (Pa. 1971).

Moreover, sentencing courts in Pennsylvania have statutory authority to grant

compassionate release on medical grounds. *See* 42 Pa. Cons. Stat. § 9777.

In the instant case, Petitioner has not sought relief pursuant to 42 Pa. Cons.

Stat. § 6502(a). Moreover, a review of the docket for his criminal proceedings

indicates that he has not petitioned the sentencing court for any type of

compassionate release. *See Commonwealth v. Davis*, Docket No. CP-23-CR-

0000323-1980 (Delaware Cty. C.C.P.). The exhaustion requirement may be excused

if "there is an absence of available State corrective process; or circumstances exist

that render such process ineffective to protect the rights of the applicant." 28 U.S.C.

§ 2254(b)(1)(B). Nothing in the record suggest that such circumstances are present.

Petitioner's § 2254 petition is, therefore, subject to dismissal for failure to exhaust

available state court remedies. *See Report and Recommendation*, *Massey v. Estock*,

No. 1:20-cv-271 (W.D. Pa. Mar. 11, 2021) (Doc. No. 25) (recommending that state

prisoner's § 2254 petition seeking home confinement be dismissed without prejudice

for failure to exhaust); *see also Tripathy v. Schneider*, 473 F. Supp. 3d 220, 228-32

(W.D.N.Y. 2020) (dismissing a prisoner's § 2254 petition seeking relief due to

COVID-19 as unexhausted when the inmate filed a state law habeas petition but

failed to appeal the denial of that petition); *Clauso v. Warden*, No. 20-5521, 2020

WL 2764774, at *2 (D.N.J. May 27, 2020) (dismissing state prisoner's § 2254

petition seeking release due to COVID-19 for failure to exhaust available state remedies); *Malloy v. Dist. Att'y of Montgomery Cty.*, 461 F. Supp. 3d 168, 171-72 (E.D. Pa. 2020).

The Court is sympathetic to Petitioner's concerns about contracting the COVID-19 virus.  Petitioner, however, has not exhausted his available state remedies for seeking home confinement, and nothing in the record before the Court suggests that his failure to do so should be excused.  The Court, therefore, will dismiss his § 2254 petition without prejudice for failure to exhaust.[2]

## III.    CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. § 2253(c), unless a circuit justice or judge issues a certificate of appealability ("COA"), an appeal may not be taken from a final order in a proceeding under 28 U.S.C. § 2254.  A COA may issue only if the applicant has made a substantial showing of the denial of a constitutional right.  28 U.S.C. § 2253(c)(2).  "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."  *Miller-El v. Cockrell*, 537 U.S. 322 (2003).

---

[2] Respondents argue in the alternative that Petitioner's § 2254 petition should be denied on the merits because he cannot establish that his Eighth Amendment rights were violated through deliberate indifference.  (Doc. No. 8 at 11.)  Given the Court's conclusion that Petitioner failed to exhaust his available state court remedies prior to filing his § 2254 petition, the Court declines to address the merits of Petitioner's Eighth Amendment claim.

"When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a COA should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  In the instant matter, jurists of reason would not find the disposition of Petitioner's petition debatable.  As such, no COA will issue.

## IV.    CONCLUSION

For the foregoing reasons, Petitioner's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 (Doc. No. 1) will be dismissed without prejudice for failure to exhaust available state remedies and a COA will not issue.  An appropriate Order follows.

s/ Sylvia H. Rambo<br>
United States District Judge

Dated: April 1, 2021